UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 16-CR-184 RHK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | **GOVERNMENT'S POSITION ON SENTENCING** |
| MICHAEL LAMONT HUGHES, | |
| Defendant. | |

## I.   INTRODUCTION

The United States of America, by and through its attorneys, Gregory G. Brooker, Acting United States Attorney for the District of Minnesota, and Amber M. Brennan, Assistant United States Attorney, hereby files this Position on Sentencing with regard to the sentencing of Defendant Michael Lamont Hughes.

The United States has no objections to the Presentence Investigation Report ("PSR"), and incorporates the facts and guideline calculations therein.

Based on the facts of this case, the PSR, the United States' motion for departure (Dkt. 22), and the factors set forth at Title 18, United States Code, Section 3553(a) (hereinafter "section 3553(a)"), the Government respectfully recommends a sentence of time served, followed by two years of supervised release, and mandatory restitution to be determined by the Court at the time of sentencing.

## II.    RELEVANT FACTS AND PSR FINDINGS

*a. The Offense Conduct*

The circumstances of the offense are set forth in detail in the Presentence Investigation Report ("PSR") and the parties' Plea Agreement and Sentencing Stipulations ("PA"). (PSR ¶¶ 19-44, 59, 63-64; PA ¶ 2). An overview of the facts most relevant to sentencing follows.

Hughes, along with 10 defendants charged in related cases and several other individuals who have not been charged, participated in a counterfeit check scheme that was conducted at banks and check cashing businesses throughout the Twin Cities metropolitan area and elsewhere between 2009 and 2012. There were three essential roles performed by the participants in this scheme: first, that of a manufacturer, who provided the checks used to conduct the fraudulent transactions; second, that of a manager/recruiter, whose function was to facilitate the transactions by connecting manufacturers with check passers or "runners" and to assist the transactions by supporting the runners in a multitude of ways, including providing the runners with the checks, driving runners to conduct the transactions, and instructing runners on how to conduct the transactions; and finally, the role of the "runner," who, as already indicated, carried out the fraudulent transactions by presenting counterfeit checks at check cashing businesses or financial institutions, thereby supplying their names and faces to the conspiracy in exchange for a cut of the proceeds.

In order for a transaction to be successful, a counterfeit check had to utilize a real bank account number along with a real routing number and business name. Conspirators obtained information about legitimate business bank accounts and customers from a variety

of sources, including from paychecks that employers had issued to them, their friends, or family members, or from other types of business checks that they or their associates had received. Manufacturers then used the legitimate account information to create counterfeit checks purporting to draw from those accounts. They entered names of real businesses, along with the bank account numbers and routing numbers of the banks where those accounts were held, into their check writing software as the "payor" accounts from which the counterfeit checks drew. Manufacturers then printed the checks onto blank check stock so that they would look and feel like real business checks.

The counterfeit checks were usually made payable to runners who had agreed to present the checks at banks and businesses in order to obtain cash proceeds. In some instances, the runners were able to successfully negotiate the checks for cash instantly. In other instances, they were required to deposit the checks and then wait for a period of time before withdrawing the funds. In either case, conspirators were frequently able to withdraw some or all of the amount of the deposited checks before the fraud was discovered.

Conspirators also obtained legitimate personal checks for use as part of the scheme. They obtained real personal checks from friends, family members, or acquaintances; they also used personal checks that were stolen and personal checks from closed bank accounts. Conspirators then used these once-legitimate personal checks to commit fraud in the same way as they used the counterfeit checks – by making the checks payable to runners in amounts that were not available in the accounts, and then negotiating the checks to try to obtain proceeds before the fraud was discovered.

Hughes participated in this conspiracy as a "recruiter" during a five-month period between March and July, 2012. Hughes solicited "runners" who would agree to negotiate counterfeit checks that Hughes would provide to them in exchange for a cut of the proceeds. Hughes obtained the counterfeit checks from Momodu Sesay (16-CR-265(1) (ADM/HB)), who manufactured the checks. Hughes and other coconspirators, including Mohammed Kromah and Charles Dean (16-CR-265(4)-(5) (ADM/HB)), would then transport the runners to various banks and check cashing businesses, including Walmart, and would instruct the runners on how to open bank accounts and/or negotiate the counterfeit checks.

  *b. Characteristics of Hughes*

Hughes committed the instant offense conduct in mid-2012, when he was 19 years old. Although Hughes was involved in the scheme for a relatively short period, his involvement was significant during that time. Hughes recruited multiple runners and he facilitated and directed their fraudulent transactions on numerous occasions by providing them with counterfeit checks, and then assisting and transporting them to negotiate those checks.

Other than the instant offense conduct, Hughes has never committed a serious crime and has very little criminal history. (PSR ¶¶ 87-103.) He has no felony convictions. He has one petty misdemeanor conviction for theft (2011), one petty misdemeanor conviction for littering (2012), and one misdemeanor conviction for possession of marijuana in a motor vehicle (2011). Hughes' only other offenses are driving violations – mostly for driving without insurance or with a suspended or revoked license – offenses that commonly plague low-income individuals who drive without insurance and end up with a suspended

license because they cannot afford to pay the fine, and thereafter become caught up in a cycle that is difficult to escape. On one occasion, Hughes served 2 days in jail after he was arrested on a warrant for failing to show up on a driving after revocation charge. Other than that, Hughes has never failed to show up for court and he has never been incarcerated.

Hughes has worked full-time for the same employer, a moving company, for the last four years (since 2013) and he earns $2,200 per month. He lives with his significant other of eight years, D.R., who earns $1,800 a month at her job, and together they are raising their four-year old daughter. (PSR ¶ 113.) Between 2013 and 2015, Hughes completed 27 credits at community college earning a GPA of 2.35. (PSR ¶ 123.)

In 1995, when Hughes was three years old, his mother was killed in a drive-by shooting in Minneapolis while she was holding him in her arms. Hughes' father is currently in prison and has been in prison most of Hughes' life; he was raised by his grandmother and maternal aunt. (PSR ¶¶ 111-12.)

In 2015, law enforcement approached Hughes for the first time to inquire about the instant offense. He immediately admitted his participation in the offense, even describing additional conduct of which the United States was not previously aware, and pled guilty to an Information.

### III.   ARGUMENT

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range, considers any grounds for departure, and, after hearing from the parties, considers the section 3553(a) factors to determine an appropriate sentence. 552 U.S. at 49-50; *United*

*States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009).  Those factors include, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," and "the need to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a).

As set forth above, the Government agrees with the PSR, which concluded that Hughes' advisory Guidelines range is 12-18 months' imprisonment.  However, in this case, as more fully set forth in the United States' motion for a departure and based upon the 3553(a) factors, the United States believes that a sentence of time served, followed by two years of supervised release, is the appropriate sentence.

Hughes has minimal criminal history – he has no felony convictions either before or subsequent to the instant offense, and in his lifetime, he has spent just two days in jail. He has worked full-time at the same job for the last four years – a significant accomplishment for any 24-year-old man – and is living with and supporting his significant other and their four-year-old daughter.  Hughes has also made progress toward getting a college degree.  He readily accepted responsibility for his involvement in the instant offense, and has complied with all the terms of his supervision over the last year.

This offense conduct appears to be an aberration in what has otherwise been a law-abiding life for this young man, who has consistently worked at a low wage laborious job to support himself and his family, who has no history of violence or any other serious criminal activities.   Hughes has managed these accomplishments despite difficult

circumstances in childhood, including the fact that his mother was murdered and his father has been serially incarcerated most of his life.

Hughes has been sufficiently deterred, he is not a danger to the public, and he has demonstrated his ability to be a law abiding and productive member of the community. In Hughes' situation, contending with a felony conviction on his record is a consequence that is sufficient, but not greater than necessary, to satisfy the objectives set forth in section 3553(a). In the Government's view, imprisoning Hughes will not serve the statutory objectives or the public interest. What will serve the public interest and the goals of sentencing is to allow Hughes to continue working, taking care of his family, and continuing his education or other efforts to better himself under the Court's supervision.

### IV.   CONCLUSION

Based on the foregoing, the Government respectfully asks the Court to grant its motion for a departure and variance, and to sentence Hughes to time served followed by two months of supervised release, and restitution to be determined by the Court at the time of sentencing. Such a sentence achieves a reasonable punishment for Hughes' offense and serves the goals embodied by section 3553(a), but is not greater than necessary to do so.

Dated: July 27, 2017

        Respectfully Submitted,

        GREGORY G. BROOKER
        Acting United States Attorney

        *s/Amber M. Brennan*
        BY:  AMBER M. BRENNAN
        Assistant U.S. Attorney